CARAWAY, J.
 

 11 Ruth E. Morrison was convicted by a jury of aggravated rape and aggravated oral sexual battery and received concurrent sentences of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on the rape conviction and 20 years at hard labor for the battery conviction. Morrison appeals urging five assignments of error. Morrison’s convictions and sentences are affirmed.
 

 Facts
 

 In 1997, Morrison was charged with the aggravated rape and aggravated oral sexual battery of then nine-year-old J.M. More specifically, the bill of indictment alleged that Morrison aided and abetted her husband, Danny R. Morrison, in his having vaginal intercourse with J.M. and that Morrison had oral sex with the child.
 

 lain April of 1997, Morrison asked J.M.’s aunt,
 
 [1]
 
 who was a family friend, if J.M. could spend the weekend at her house to attend a church function with her on Sunday. When J.M. arrived home on Sunday,
 
 *861
 
 she told a family member that Morrison and her husband touched her vagina with their tongues more than once and that Morrison’s husband, Danny Morrison, tried to have sex with her. J.M. also told the family member that the incidents were videotaped. The next day, J.M.’s family took her to Child Protection Services, then to the Jackson Parish Sheriffs Office. During an interview at the sheriffs office, J.M. informed officers about the incident and that there was a videotape. Later that day, J.M. was taken for an examination by the Winn Parish Coroner, Dr. R.L. Williams, who found evidence of sexual abuse. During a search of the Morrison residence, sheriffs office investigators seized a videotape which contained footage of the acts described by J.M.
 

 Following the execution of the search warrant, Morrison and her husband were arrested. Danny Morrison pled guilty to aggravated rape and was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence in May of 1998. Morrison originally entered a plea of not guilty but issues were raised concerning her competency to proceed to trial. After a sanity hearing, the court concluded |Rthat Morrison was unable to proceed to trial due to an inability to understand the proceedings against her and to assist counsel in her defense. As a result of her incompetence, Morrison was committed to a state mental institution.
 

 After approximately 8 years, on August 6, 2008, the court deemed Morrison competent to proceed to trial, and ordered that she be returned to the custody of the Jackson Parish Sheriffs Office. In preparation for the sanity hearing, Morrison was examined by Dr. James B. Pinkston, Ph. D., M.P. In his report dated March 11, 2008, Dr. Pinkston stated that he was hired by “Ms. Morrison’s attorney to help determine her sanity at the time of the alleged offense, her ability to proceed to trail [sic ] and her capacity to assist counsel.” In his evaluation, Dr. Pinkston considered all of the mental health difficulties that Morrison had in her life. He ultimately concluded that she was capable of assisting with her defense and communicating with her attorneys. Most importantly, Dr. Pinkston found that at the time Morrison committed the offenses she was able to distinguish between right and wrong. Specifically, he noted:
 

 Evidence indicates that Ms. Morrison possesses sufficient cognitive resources to allow her to appreciate the appropriateness and potential wrongfulness of her behavior, and she indicated feeling that her behavior was wrong at the time of her offense.
 

 |/Thereafter, on February 17, 2009, Morrison withdrew her former plea of not guilty, and entered a plea of not guilty and not guilty by reason of insanity. A joint motion to consolidate the charges was granted by the trial court. Following the conclusion of the jury trial, Morrison was found guilty as charged. She received concurrent sentences of life in prison at hard labor, without benefit of parole, probation, or suspension of sentence on the aggravated rape conviction and 20 years’ imprisonment at hard labor for the aggravated oral sexual battery conviction. After a timely motion for reconsideration of sentence was denied, this appeal by Morrison ensued.
 

 On appeal, Morrison raises issues of insufficient evidence to convict her of both offenses, ineffective assistance of trial counsel, and court error.
 

 Discussion
 

 I.
 

 Morrison argues that there is insufficient evidence to prove her guilt for the offense of aggravated rape beyond a rea
 
 *862
 
 sonable doubt because the state failed to prove that her husband penetrated J.M., a requisite element of the crime of rape. Alternatively, Morrison argues that if the court concludes that an aggravated rape did occur, the defense of justification due to her fear of her husband warrants the reversal of both of her convictions despite her admission to the crime of aggravated oral sexual battery.
 
 [2]
 

 15At the time of the offense, La. R.S. 14:41 in pertinent part, provided:
 
 [3]
 

 A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.
 

 B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however' slight, is sufficient to complete the crime.
 

 Likewise, La. R.S. 14:42 provided in pertinent part,
 
 [4]
 

 A. Aggravated rape is a rape committed upon a person ... where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
 

 [[Image here]]
 

 (4) When the victim is under the age of twelve years. Lack of knowledge of the victim’s age shall not be a defense.
 

 (5) When two or more offenders participated in the act.
 

 A violation of La. R.S. 14:41 occurs when there is any penetration, however slight, of the aperture of the female genitalia, even its external features.
 
 State v. Bertrand,
 
 461 So.2d 1159 (La.App. 3d Cir.1984),
 
 writ denied,
 
 464 So.2d 314 (La.1985).
 

 In this matter, Morrison was charged as a principal to aggravated rape. The law of principals as set forth in La. R.S. 14:24 provides:
 

 IfiAll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
 

 At the time of the offense, La. R.S. 14:43.4 defined aggravated oral sexual battery in pertinent part as follows:
 
 [5]
 

 
 *863
 
 A. Aggravated oral sexual battery is an oral sexual battery committed when the intentional touching of the genitals or anus of one person and the mouth of or tongue of another is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
 

 [[Image here]]
 

 (4) When the victim is under the age of twelve years. Lack of knowledge of the victim’s age shall not be a defense.
 

 (5) When two or more offenders participated in the act without the consent of the victim.
 

 La. R.S. 14:18 provides in pertinent part:
 

 The fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
 

 [[Image here]]
 

 (6) When any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed[.]
 

 |7The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 01-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Carter,
 
 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181,
 
 writ denied,
 
 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 05-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833,
 
 writ denied,
 
 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La. App.2d Cir.2/25/09), 3 So.3d 685,
 
 unit denied,
 
 09-0725 (La.12/11/09), 23 So.3d 913,
 
 cert. denied,
 
 — U.S. —, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010);
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 
 See also, State v. Bowie,
 
 43,374 (La.App.2d Cir.9/24/08), 997 So.2d 36,
 
 writ denied,
 
 08-2639 (La.5/22/09), 9 So.3d 141 (same deference applies to bench trial).
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed,
 
 *864
 
 the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La. App.2d Cir.1/14/09), 2 So.3d 582,
 
 writ denied,
 
 09-0372 (La.11/6/09), 21 So.3d 299;
 
 State v. Parker,
 
 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497,
 
 writ denied,
 
 07-2053 (La.3/7/08), 977 So.2d 896.
 

 The defense of justification is an affirmative defense that must be proven by a preponderance of the evidence.
 
 State v. Cheatwood,
 
 458 So.2d 907 (La.1984);
 
 State v. Brazil,
 
 34,341 (La.App.2d Cir.4/4/01), 784 So.2d 734;
 
 State v. Shed,
 
 36,321 (La.App.2d Cir.9/18/02), 828 So.2d 124,
 
 writ denied,
 
 02-3123 (La.12/19/03), 861 So.2d 561. The defense of justification |acan be claimed when any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed. In reviewing a conviction in which the defendant offered testimony that his criminal actions were justified, a reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Bosley,
 
 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La.10/17/97), 701 So.2d 1333.
 

 The state presented the testimony of Chief Criminal Deputy Stephen Watts who testified that he received the initial report of the subject crime on April 18, 1997. On that date, Deputy Watts spoke with J.M. who reported that Morrison and her husband had “sexually assaulted” her. J.M. also informed Deputy Watts about the videotape of the incident. Accordingly, Watts procured a search warrant of the Morrison home. Deputy Watts testified that a videotape depicting the crime was seized from the Morrison home. He stated that he viewed the tape which was later introduced into evidence. Deputy Watts identified J.M., Morrison and Danny Morrison from the video. He stated that from this incident, Danny Morrison pled guilty to aggravated rape. Evidence of Danny Morrison’s judgment of conviction was | mintroduced into evidence. Deputy Watts was present when Morrison was arrested and did not notice any bruising on her person; he also testified that Morrison appeared coherent at the time.
 

 The videotape of the crime was played for the jury. The video begins with the victim sleeping fully dressed. The next scene in the video shows the victim totally nude with her legs spread wide open by Morrison. The defendant’s husband is filming the scene and at some point focuses the camera directly on the victim’s vagina. Morrison can be heard promising the victim $10 “to do whatever she wants” and a “bicycle” for her participation. During the filming, Morrison states that in order to get $10 and a bicycle the victim “has to play with him [the husband] as much as he plays with you [the victim].” After that, the defendant encourages her husband to stop filming and join them. Morrison’s husband then comes over and performs oral sex on the victim for several minutes. During the videotape, Morrison’s husband performs oral sex on the victim on more than one occasion. The defendant also clearly performs oral sex on the victim. While doing that, the victim is forced to rub on the husband’s penis and to perform oral sex on him.
 

 The video shows that the victim’s vagina was digitally penetrated by both the defendant and her husband on at least 4 to 5
 
 *865
 
 different occasions. [, tThe video also shows that Morrison’s husband takes his penis and places it directly on the victim’s vagina on at least two different occasions. During the first occasion, he moves his hips back and forth in a thrusting motion at least 4 to 5 different times. During the second occasion, he places his penis on the victim’s vagina and moves his hips back and forth with an increasingly intense thrusting motion at least 15 to 20 times. The video concludes with Morrison performing oral sex on her husband while the victim watches. She then has vaginal intercourse with her husband. During both acts, they try to entice the victim to touch the defendant’s husband by reminding her of the $10 and bicycle.
 

 Dr. Randolph Williams, Winn Parish Coroner, testified concerning the results of his medical examination of J.M., who he testified was under the age of 12 at the time. Dr. Williams testified as follows:
 

 Q. All right. What are the results of any of your findings of the examination that you made of [J.M.] with reference to the organs that you’ve described?
 

 A. Okay, specifically, from the report, physical examination. Introitos, that the opening to the vagina itself ... The introitos is noted to be red, irritated, and that is the entire round circular area in the beginning of the vagina. That’s called the in-troitos. Okay, it’s red, irritated, and inflamed.
 

 Q. Okay, How about the hymen ring, did you make-
 

 [ 12A. Hymenal ring shows evidence of recent, recent partially healed tears. Very red, inflamed and irritated, and painful to the touch.
 

 Dr. Williams could not specify whether a finger or a penis caused the entrance to J.M.’s vagina to be inflamed, although he did not find anything inconsistent with penile penetration.
 

 J.M., who was 21 years old at the time of trial, testified that Morrison put her mouth or tongue on J.M.’s vagina. J.M. also testified that Morrison’s husband “put his penis” against her vagina, but she could not recall if he penetrated her. J.M. stated that Morrison assisted her husband in that act. J.M. stated that at some point during the weekend, she asked Morrison whether she could go home. Morrison told her that her aunt and uncle were at a casino and that J.M. could not go home. J.M. testified that she never heard Morrison’s husband threaten Morrison, yell at her or hit her. Morrison never told the child that her husband made her do those things. Morrison told J.M. not to tell anybody, and she offered her a bike and money in exchange for the child’s silence.
 

 The defense presented several witnesses on Morrison’s behalf. Arvie Huckaby, Morrison’s sister, gave an overview of Morrison’s life. She indicated that her sister had been married 5 times and all 5 spouses were abusive. With respect to Danny Morrison, Huckaby relayed several violent | ^assaultive incidents that she witnessed. On one occasion, Danny Morrison went to Huckaby’s house armed with a gun and told her he would kill her if she interfered with his marriage. Morrison was present and observed the incident. After this incident, Morrison would visit Hucka-by’s home but was only allowed to stay for 15 minutes at a time. At one point, Danny Morrison told Huckaby “if you call her, I will kill her.” Finally, Morrison’s husband showed Huckaby a map of his stepfather’s property and said that he would kill Morrison and bury her there.
 

 Terry Folden, who is related by marriage to Morrison, testified that she witnessed Morrison’s husband straddle Morrison with his knees on each side of her
 
 *866
 
 body and hit her. Folden testified that she offered to help Morrison, but Morrison heard her husband in the background ordering her to make Folden leave or he would kill them both.
 

 Debbie Clifton, Morrison’s daughter, also testified. She was present for the incidents described by Huckaby and offered similar testimony which supported Huckaby’s contentions. Additionally, Clifton testified that on two occasions Danny Morrison nailed the doors to the family residence shut from the outside so that Morrison could not get out of the house.
 

 Dr. Dennis Kelly, an expert in psychiatry and clinical director of the Greenwell Springs Hospital, an acute psychiatric facility, testified that at the |14time of her arrest, Morrison suffered from a delusional disorder, although he was not sure of the full extent of the illness. She claimed to be a model, singer, college teacher, sheriff and private investigator upon her admission to the hospital in 2000 and denied being the person who had harmed J.M. Dr. Kelly stated that in his opinion he could say with “reasonable degree of medical certainty” that Morrison “had an emotional reaction to what happened in this case ... that was a very strong reaction and that given her underlying psychiatric vulnerabilities ... caused her to have what we would call a psychotic break with reality.” Dr. Kelly also diagnosed Morrison with paraphilia, deviant sexual arousal or deviant sexual behavior that does not necessarily rise to the level of pedophilia.
 

 On cross-examination, Dr. Kelly admitted that when Morrison began to admit her identity and participation in the crime in 2004, she never asserted that her husband forced her to participate in the crime.
 

 Rachel Scott, a domestic violence expert, testified that she had reviewed the instances of violence committed by Morrison’s husband against Morrison and concluded that she was a victim of domestic violence and that she was in fear for her safety from Danny Morrison. Scott testified that because of Morrison’s limited cognitive functioning, she was more vulnerable to intimidation and control than other women who might have a | ^different background and level of functioning. Scott testified that Morrison was in survival mode and would do whatever it took to avoid the abuse inflicted by her husband, including commission of criminal acts.
 

 Dr. Mark Vigen, Ph.D., a clinical psychologist, reviewed all of Morrison’s records and he, along with members of his staff, interviewed her. Dr. Vigen found that Morrison had an IQ range of 65-75, was a mildly retarded, passive, dependent person who relied on others for direction. Dr. Vigen testified that Morrison had a history of mental illness including undirected paraphilia. Dr. Vigen stated that Morrison has external locus of control, meaning that she felt she had no power in her life. He admitted that such an external locus did not necessarily indicate criminal activity. Dr. Vigen testified that Morrison fit the psychological definition of an individual with battered wife syndrome. He explained that battered women minimize and rationalize and deny the wrong behavior they perform for their spouses. Similar to Scott, Dr. Vigen also found that Morrison was living in fear of her husband and was in survival mode. This caused her to do things out of fear and avoidance of violence.
 

 On cross-examination, Dr. Vigen admitted that Morrison’s truthfulness would have an impact on his opinions. He testified that although both he and Dr. Pinkston had concerns about Morrison’s truthfulness in the 11fiIQ testing, extensive testing did not indicate that Morrison was a malingerer in regard to her delusional disorder.
 

 
 *867
 
 Morrison’s first argument relating to proof of aggravated rape is that the state failed to prove sexual penetration. The evidence presented at trial is sufficient to support Morrison’s conviction as a principal to the charge in that she acted in concert with Danny Morrison in the sexual abuse of the child. Regarding the sexual penetration, Dr. Williams’ testimony. and the videotape were sufficient to establish the overwhelming implication that penetration did in fact occur. J.M. recalled that Danny Morrison put his penis against her vagina. The videotape clearly shows that the defendant’s husband placed his penis against the victim’s vagina and engaged in a repeated thrusting motion. Dr. Williams confirmed from his examination that the injury to the victim’s vagina indicated the requisite penetration for the crime of rape. From this evidence, the jury could have concluded beyond a reasonable doubt that penetration occurred during the perpetrator’s sexual intercourse with the child with Morrison’s voluntary participation.
 

 Additionally, the record does not contain a preponderance of evidence to support Morrison’s claim that her commission of either offense was justified. While the testimony presented during Morrison’s case-in-chief supports her contention that she suffered abuse at the hands of her husband, |17the evidence does not show that at the time she committed either offense she was in imminent peril of great bodily harm, or reasonably believed herself or others to be in such danger. In stark contrast, the testimony presented by the State established that: (1) Morrison alone brought J.M. to her residence; (2) before and during the offenses, J.M. did not observe Danny Morrison threaten the defendant; (3) before the offenses occurred Morrison lied to J.M. to keep her at the residence after J.M. asked to return home; (4) after the offenses Morrison offered J.M. money and gifts to keep quiet; (5) when Morrison returned J.M. home, she made no mention of the offenses; (6) the videotape of the incident does not reveal Morrison’s husband threatening her in any way, but instead shows her participating willingly in the acts of abuse committed by her husband against J.M.; and (7) Morrison committed independent crimes against the child. Because the evidence presented by the State is wholly inconsistent with any claim of immediate peril, Morrison’s claim of justification lacks merit.
 

 II.
 

 In her second assignment of error, Morrison argues that her trial counsel’s performance was deficient because he failed to proceed with her defense of not guilty by reason of insanity. She claims that her lawyer [ 1simpermissibly abandoned the defense without adequate information to do so. She also claims that there is no evidence in the record to establish whether her competency at the time of the offense was ever tested.
 

 Although a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief rather than on appeal, this Court may resolve the issue on direct appeal if the record is sufficient. La. C. Cr. P. art. 930;
 
 State v. Willars,
 
 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673.
 

 To establish that his attorney was ineffective, the defendant first must show that counsel’s performance was deficient.
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This requires a showing that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment.
 
 Id.
 
 The relevant inquiry is whether counsel’s representation fell below the standard of rea
 
 *868
 
 sonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases.
 
 Id.
 
 The assessment of an attorney’s performance requires his conduct to be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment.
 
 State
 
 |19v.
 
 Grant,
 
 41,745 (La.App.2d Cir.4/4/07), 954 So.2d 823,
 
 writ denied,
 
 07-1193 (La.12/7/07), 969 So.2d 629;
 
 State v. Moore,
 
 575 So.2d 928 (La.App. 2d Cir.1991).
 
 See also, State v. Tilmon,
 
 38,003 (La.App.2d Cir.4/14/04), 870 So.2d 607,
 
 writ denied,
 
 04-2011 (La.12/17/04), 888 So.2d 866.
 

 Second, the defendant must show that counsel’s deficient performance prejudiced his defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable.
 
 Strickland, supra.
 
 The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings.
 
 Id.
 
 Rather, he must show that but for counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different.
 
 Id.; State v. Pratt,
 
 26,862 (La.App.2d Cir.4/5/95), 653 So.2d 174,
 
 writ denied,
 
 95-1398 (La.11/3/95), 662 So.2d 9. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice.
 
 Strickland, supra; State v. Jordan,
 
 35,643 (La.App.2d Cir.4/3/02), 813 So.2d 1123,
 
 writ denied,
 
 02-1570 (La.5/30/03), 845 So.2d 1067.
 

 _[2¡¡In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La. R.S. 15:432. To rebut this presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La. C. Cr. P. art. 652.. Criminal responsibility is not negated by the mere existence of mental disease or defect. To be exempted of criminal responsibility, defendant must show she suffered a mental disease or mental defect which prevented her from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14;
 
 State v. Silman,
 
 95-0154 (La.11/27/95), 663 So.2d 27;
 
 State v. Foster,
 
 26,134 (La.App.2d Cir.12/9/94), 647 So.2d 1224,
 
 writ denied,
 
 95-0548 (La.6/30/95), 657 So.2d 1026.
 

 In this matter, Morrison chose to go to trial maintaining a plea of not guilty by reason of insanity. At trial, the defense presented the only expert testimony regarding the issue of Morrison’s mental health. Nevertheless, both experts limited their opinion testimony to the consideration of the battered spouse syndrome, with neither being asked for an opinion regarding Morrison’s ability to distinguish between right and wrong at the time of the offense. In fact, in closing arguments, defense counsel conceded that the experts were not asked that question because “that’s not our defense in this case.” The earlier psychiatric assessment of Morrison by Dr. Pinkston, who Li had indicated in his opinion that Morrison was able to distinguish between right and wrong at the time of the offense, was not presented to the jury. Thus, from the record before us, a complete understanding of the abandonment of the insanity defense cannot be gained for a determination of whether ineffective assistance of counsel occurred. With this insufficiency in the present rec
 
 *869
 
 ord, this matter more properly lends itself to the presentation of evidence at a post-conviction hearing. Accordingly, the issue raised by this assignment of error must be raised through an application for post-conviction relief.
 

 III.
 

 In her third assignment of error, Morrison contends that the trial court erred in refusing to grant her pretrial motion to suppress the search warrant because the description of the place to be searched was inadequate. More specifically, Morrison argues that the search warrant was invalid because it incorrectly stated that the Morrison house was the only house at the end of the driveway. As a result, Morrison argues that the videotape seized as a result of the search should have been suppressed and her convictions reversed.
 

 Both at the pretrial hearing and trial, Jackson Parish Sheriffs Deputy Stephen Watts testified regarding his preparation and execution of the search | ^warrant at issue. Deputy Watts obtained the search warrant for the Morrison residence after speaking with J.M. Deputy Watts, who was familiar with the location of the Morrison residence, drove there and took pictures of the residence to attach to his search warrant. The application for the search warrant described the residence as follows:
 

 if one was traveling south on U.S. Highway 167 from Jonesboro, toward Winn-field, you would enter the community known as Wyatt, you would turn left onto Louisiana 505 and travel east 1.5 miles, and you find a mailbox on the left side of the road with the name DANNY in orange letters on top of the mailbox. The driveway is at the mailbox. You would turn to the left off of highway 505 into the driveway, you would travel approximately 400 feet to the only residence on the driveway. The residence is at the end of the driveway and consists of a barn type structure and an upstairs area that contains the residence. This residence is known by affi-ant to be the residence of Danny and Ruth Morrison.
 

 The law addressing this issue is provided in La. C. Cr. P. art. 162, which states:
 

 A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant.
 

 A search warrant shall particularly describe the person or place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search or seizure.
 

 123The description contained in the search warrant is adequate if it is sufficiently detailed so as to allow the officers to locate the property with reasonable certainty and with reasonable probability that they will not search the wrong premises.
 
 State v. Korman,
 
 379 So.2d 1061 (La.1980);
 
 State v. Petta,
 
 354 So.2d 563 (La.1978);
 
 State v. Cobbs,
 
 350 So.2d 168 (La.1977). Hence, “a minor error in a portion of the description of the premises to be searched does not invalidate the search.”
 
 Korman, supra.
 
 But, if police officers knowingly search an entirely different premises than that described in the warrant, the evidence seized will be suppressed because the warrant did not particularly describe the place to be searched.
 
 State v. Manzella,
 
 392 So.2d 403 (La.1980).
 

 In this case, the residence which was searched by the police was “particularly described” in the warrant. In fact, the search warrant specifically describes the route Deputy Watts took in order to arrive at the Morrison residence. More
 
 *870
 
 over, the photographs depicting the residence leave little possibility for error. Although other structures were on the property, they were across the pond and approximately 100 yards from the building Deputy Watts described in the search warrant as the Morrison residence. Given Deputy Watts’ familiarity with the location of Morrison’s residence and the meticulousness with which he acted in securing the 124warrant, there is no merit to Morrison’s contention that the search warrant did not describe the place to be searched with sufficient particularity.
 

 IV.
 

 Morrison argues that the trial court erred by failing to grant a mistrial when the prosecutor referred to her affirmative defense of justification as an excuse. She claims that this description of her defense by the prosecutor was an inaccurate statement of the law and prejudiced her defense.
 

 During voir dire, the prosecutor stated that an affirmative defense “is basically for lack of a better word, an excuse.” Morrison’s trial counsel moved for a mistrial which was denied by court. In so ruling, the trial judge stated:
 

 And I’m concerned about the language but I don’t think the defendant has been prejudiced at this point and if we move forward and be more careful about telling the jury that they think the Judge is going to instruct them as to what the law may be.
 

 When the jury returned to the courtroom, the trial judge admonished them that comments made by lawyers were not necessarily the correct law and he would instruct them on the law whenever the appropriate time came.
 

 La. C. Cr. P. art. 775 provides in pertinent part:
 

 Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial.
 

 12r,A prosecutor’s misstatements of the law during voir dire examination, or in his opening and closing remarks, do not require reversal of a defendant’s conviction if the court properly charges the jury at the close of the case.
 
 State v. Cavazos,
 
 610 So.2d 127 (La.1992). The court will not reverse a conviction if not “thoroughly convinced” that the argument influenced the jury and contributed to the verdict.
 
 State v. Legrand,
 
 02-1462 (La.12/3/03), 864 So.2d 89,
 
 cert. denied,
 
 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005). The determination of whether actual prejudice has occurred which would warrant a mistrial lies within the sound discretion of the trial judge; this decision will not be overturned on appeal absent an abuse of that discretion.
 
 State v. Weary,
 
 03-3067 (La.4/24/06), 931 So.2d 297,
 
 cert. denied,
 
 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).
 

 In
 
 State v. Cheatwood, supra,
 
 the Louisiana Supreme Court stated the following in referring to justification defenses:
 

 Since “justification” defenses are not based on the nonexistence of any essential element of the offense, but rather on circumstances which make the accused’s conduct excusable on policy grounds, such defenses should be treated as affirmative defenses which the accused must establish by a preponderance of evidence.
 

 (Emphasis Added.)
 

 12(jEven if the prosecutor’s reference to Morrison’s affirmative defense of justification as an “excuse” is considered as an incorrect and misleading statement of law, the trial judge instructed the jury
 
 *871
 
 when they were empaneled that comments made by the lawyers were not necessarily the correct statement of the law. Moreover, the record reflects that the trial court properly instructed the jury on the defense of justification, thus further curing any possible prejudice which may have occurred in the prosecutor’s comment. For these reasons, this assignment of error has no merit.
 

 V.
 

 Morrison argues that under the circumstances of this ease the mandatory life sentence imposed by the trial court for her conviction for aggravated rape constitutes cruel, unusual, and excessive punishment under the U.S. Constitution. Similarly, she contends that her sentence of 20 years for her conviction for aggravated oral sexual battery is excessive due to her low IQ, history of physical and sexual abuse and the lack of a meaningful relationship with her mother.
 

 At the time Morrison committed the offense of aggravated rape, La. R.S. 14:42 provided in pertinent part:
 

 C. Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. However, if the victim was under the age of twelve years, 127as provided in Paragraph A(4) of this Section, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, of sentence, in accordance with the determination of the jury.
 

 Likewise, La. R.S. 14:43.4 defined the crime of oral sexual battery in pertinent part:
 

 C. Whoever commits the crime of aggravated oral sexual battery shall be punished by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence for not more than twenty years.
 

 This Court has held that the burden was on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional. To do so, the defendant must “clearly and convincingly show that he is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.”
 
 State v. Johnson,
 
 97-1906 (La.3/4/98), 709 So.2d 672;
 
 State v. Robbins,
 
 43,240 (La.App.2d Cir.6/4/08), 986 So.2d 828,
 
 writ denied,
 
 08-1438 (La.2/20/09), 1 So.3d 494;
 
 State v. Wade,
 
 36,295 (La.App.2d Cir.10/23/02), 832 So.2d 977,
 
 writ denied,
 
 02-2875 (La.4/4/03), 840 So.2d 1213.
 

 12flAs this Court stated in
 
 State v. Ponsell,
 
 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678,
 
 writ denied,
 
 00-2726 (La.10/12/01), 799 So.2d 490:
 

 Although ... the Louisiana Supreme Court stated that courts have the power to declare a mandatory minimum sentence excessive under Article I, Section 20 of the Louisiana Constitution, this power should only be exercised in rare cases and only when the court is firmly convinced that the minimum sentence is excessive.
 

 In
 
 State v. Foley,
 
 456 So.2d 979 (La. 1984), the Louisiana Supreme Court expounded at length on the constitutionality of the mandatory sentence found in La. R.S. 14:42. The Court held that the mandatory life sentence for aggravated rape is a valid exercise of the state legislature’s prerogative to determine the length of sentence for crimes classified as felonies. This Court has affirmed the mandatory life
 
 *872
 
 sentence for aggravated rape as not being unconstitutional.
 
 State v. Ingram,
 
 29,172 (La.App.2d Cir.1/24/97), 688 So.2d 657,
 
 writ denied,
 
 97-0566 (La.9/5/97), 700 So.2d 505.
 

 In cases where there is no mandatory sentence, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses.
 
 State v. Cozzetto,
 
 07-2031 (La.2/15/08), 974 So.2d 665;
 
 State v. McKinney,
 
 43,061 (La.App.2d Cir.2/13/08), 976 So.2d 802;
 
 State v. Woods,
 
 41,420 (La.App.2d Cir.11/1/06), 942 So.2d 658,
 
 writs denied,
 
 06-2768, 06-2781 (La.6/22/07), 959 So.2d 494.
 

 In those cases, appellate review of sentences for excessiveness is a two-pronged inquiry. First, the record must show that the sentencing court complied with La. C. Cr. P. art. 894.1. The court need not list every aggravating or mitigating factor so long as the record reflects that it adequately considered the guidelines.
 
 State v. Marshall,
 
 94-0461 (La.9/5/95), 660 So.2d 819;
 
 State v. Linnear,
 
 44,830 (La.App. 2 Cir. 12/9/09), 26 So.3d 303. When the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even in the absence of full compliance with the article.
 
 State v. Lobato,
 
 603 So.2d 739 (La.1992);
 
 State v. Linnear, supra.
 
 No sentencing factor is accorded greater weight by statute than any other sentencing factor.
 
 State v. Taves,
 
 03-0518 (La.12/3/03), 861 So.2d 144;
 
 State v. Linnear, supra.
 

 The second prong is constitutional excessiveness. A sentence violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless imposition of pain and suffering.
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993). A sentence, is deemed grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice orj^makes no reasonable contribution to acceptable penal goals.
 
 State v. Guzman,
 
 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158.
 

 Absent a showing of manifest abuse of that discretion this Court may not set aside a sentence as excessive.
 
 State v. Guzman, supra; State v. June,
 
 38,440 (La. App.2d Cir.5/12/04), 873 So.2d 939;
 
 State v. Lingefelt,
 
 38,038 (La.App.2d Cir.1/28/04), 865 So.2d 280,
 
 unit denied,
 
 04-0597 (La.9/24/04), 882 So.2d 1165.
 

 In relation to her life sentence for aggravated rape, Morrison fails to argue or present any evidence that she is an “exceptional” defendant for which downward departure from the mandatory maximum sentence for aggravated rape is warranted. Thus she has failed to clearly and convincingly show that the imposed sentence is not meaningfully tailored to the gravity of the offense. Moreover, Morrison’s poor choices and the unfortunate circumstances of her life fail to mitigate the egregiousness of an offense which involved the seeking out of a nine-year-old child for unconscionable acts of perversion.
 

 Similarly, Morrison is equally unpersuasive in her argument regarding her receipt of the maximum sentence allowed under La. R.S. 14:43.4. Adequate La. C. Cr. P. art. 894.1 compliance is evident on the record. The trial court specifically considered Morrison’s claim that she was mentally |S1 deficient and the factors she had utilized in her defense of justification. The court noted the jury’s evident rejection of her justification. Therefore, he also considered Morrison’s conduct. Her victim was a young child she knew. She put the child in danger by knowingly obtaining and subjecting the child to her
 
 *873
 
 husband — who she knew to be abusive. She lured the child to her home under the false pretense that she would take her to a church function. She knew her actions were wrong because she offered the child a reward to remain quiet. In addition to providing a reasonable factual basis for the imposed sentence, these factors also serve to qualify Morrison as the worst possible offender. Accordingly, the chosen sentence not only is meaningfully tailored to the culpability of this offender, but is suited to the gravity of the offense. Morrison’s arguments to the contrary are without merit.
 

 Error Patent
 

 An error patent review reveals that the trial court failed to specify that Morrison’s 20-year sentence for aggravated oral sexual battery be served without benefit of parole, probation, or suspension of sentence pursuant to La. R.S. 14:14.43.4. Nevertheless, when a trial court fails to order that a sentence should be served without benefit as mandated by the statute, those required restrictions are self-activating and there is no need to remand for a | ^ministerial correction of an illegally lenient sentence. La. R.S. 15:301.1(A);
 
 State v. Williams,
 
 00-1725 (La.11/28/01), 800 So.2d 790;
 
 State v. Braziel,
 
 42,668 (La.App.2d Cir.10/24/07), 968 So.2d 853.
 

 Conclusion
 

 For the foregoing reasons, Morrison’s convictions and sentences are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . J.M. lived with her aunt after the death of the child’s biological mother.
 

 [2]
 

 . Although Morrison raises the subject of her insanity plea in her ineffective assistance of counsel claim, she has not raised a sufficiency of evidence issue regarding the jury's rejection of her plea of not guilty by reason of insanity. The record shows that the jury was instructed regarding a not guilty by reason of insanity verdict. Specifically, the jury was instructed that insanity is defined as an affirmative defense if Morrison proved by a preponderance of the evidence "that because of a mental disease or defect she was incapable of distinguishing between right and wrong with reference to the conduct in question at the time of the offense[.]"
 

 [3]
 

 . Effective August 15, 2001, La. R.S. 14:41 was amended to also include oral sexual intercourse, i.e., the intentional touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender or the intentional touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim. Under this statute, when rape by "oral sexual intercourse” is committed on a person under the age of thirteen then it becomes aggravated rape and the perpetrator is subject to life in prison without benefit of parole.
 

 [4]
 

 . Effective August 15, 2001, La. R.S. 14:42(A) was amended to include oral sexual intercourse. Moreover, in order for a defendant to be charged with oral aggravated rape, the victim must have been under the age of 13 instead of 12.
 

 [5]
 

 . La. R.S. 14:43.4 was repealed by the legislature in 2001. However prosecution under this statute was still proper because its repeal
 
 *863
 
 came after Morrison’s alleged perpetration of the offense. The law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer.
 
 State v. Sugasti,
 
 01-3407 (La.6/21/02), 820 So.2d 518.